# United States District Court
## District of New Jersey

| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
|---|---|---|
| v. | : | |
| ULRICH DAVIS | : | Magistrate No. 11-3149 |

      I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From in or about August 2007 to in about January 2008, in the District of New Jersey, and elsewhere, defendant ULRICH DAVIS did:

SEE ATTACHMENT A

      I further state that I am a Special Agent of the United States Department of Commerce, Bureau of Industry and Security, and that this complaint is based on the following facts:

SEE ATTACHMENT B

_____
David J. Poole
Special Agent
United States Department of Commerce
Bureau of Industry and Security

Sworn to and subscribed in my presence,

August 5, 2011       at             Newark, New Jersey
Date                                 City and State

Hon. Patty Shwartz
United States Magistrate Judge            _____
Name and Title of Judicial Officer        Signature of Judicial Officer

## ATTACHMENT A

(Conspiracy to Unlawfully Export U.S. Goods to Iran)

From in or about August 2007 through in or about January 2008, in the District of New Jersey and elsewhere, defendant

## ULRICH DAVIS

did willfully conspire to violate regulations, the Iranian Transactions Regulations, issued under the International Emergency Economic Powers Act, by exporting, selling, and supplying goods and by causing the export, sale and supply of goods – without a license or authorization obtained from the Office of Foreign Assets Control, U.S. Department of Treasury – from the United States to Iran and the Government of Iran.

In violation of Title 50, United States Code, Section 1705, Title 31, Code of Federal Regulations, Section 560.203, Title 31, Code of Federal Regulations, Section 560.204, and Title 18, United States Code, Section 2.

ATTACHMENT B

I, David J. Poole, a Senior Special Agent with the United States Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement, am fully familiar with the facts set forth herein based on my investigation, my conversations with witnesses and other law enforcement officers, and my review of reports, documents, and items of evidence. Since this complaint is being submitted for the limited purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not set forth each and every fact that I know concerning the investigation. Where statements of others are related herein, they are related in substance and in part.

1. At all times relevant and material to this Complaint:

    a. Defendant ULRICH DAVIS, a Dutch citizen, was the Sales and Business Development Manager of a freight forwarding company located in The Netherlands ("Netherlands Freight Forwarding Company").

    b. Netherlands Freight Forwarding Company, a subsidiary of an Austrian-based company, was registered in The Netherlands, and opened in or about September 2006. The principal office of Netherlands Freight Forwarding Company was located in Rotterdam, Netherlands, with other offices located in Schiphol-Rijk and Tilberg. Netherlands Freight Forwarding Company was a firm involved in the facilitation of importing, exporting and transshipping cargo to and from The Netherlands.

    c. A freight forwarding company located in New York ("New York Freight Forwarding Company") was located in Rosedale, New York, and was the U.S. subsidiary of the Austrian-based company. New York Freight Forwarding Company was a firm involved in the facilitation of importing, exporting, and transshipping cargo to and from the United States.

1

EXPORT LAWS AND REGULATIONS

International Emergency Economic Powers Act and the Iranian Transaction Regulations

2. Pursuant to the authority created under the International Emergency Economic Powers Act ("IEEPA"), the President of the United States and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods. Title 50, United States Code, Section 1705 provides:

> (a) Unlawful acts. It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.

3. Pursuant to an Executive Order by President William Jefferson Clinton in 1995, the Secretary of the United States Department of Treasury, in consultation with the Secretary of State, promulgated the Iranian Transactions Regulations ("ITR"), Title 31, United States Code of Federal Regulations, Part 560. The ITR generally prohibit any person from exporting or causing to be exported from the United States to Iran any good or technology without having first obtained a validated export license from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC"). The ITR remain in effect.

4. The ITR imposes, among others, the following prohibition:

> Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:
>
> [A]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

That regulation further provides as follows:

> Section 560.204 - Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran:

2

> Except as otherwise authorized pursuant to this part, . . ., the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, . . ., of any goods, technology, or services to Iran or the Government of Iran is prohibited . . .

### Export Administration Act and Export Administration Regulations

5.   The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2101-2420, authorized the Department of Commerce ("DOC") to prohibit or restrict the export of any goods and technology as necessary to protect, among other things, the national security of the United States. The DOC implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. The EAR is in effect through the provisions of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, by virtue of Executive Order 13222 (August 17, 2001), as extended by successive Presidential notices.

6.   The pertinent sections of the EAR are as follows:

> 15 C.F.R. § 766.24(b): Issuance. The Assistant Secretary [of the U.S. Department of Commerce] may issue an order temporarily denying to a person any or all of the export privileges described in part 764 of the EAR upon a showing by BIS [Bureau of Industry and Security] that the order is necessary in the public interest to prevent an imminent violation of the EAA, the EAR, or any order, license or authorization issued thereunder.

> 15 C.F.R. § 736.2 (b): General prohibitions. The following…general prohibitions describe certain exports, reexports, and other conduct, subject to the scope of the EAR, in which you may not engage unless you either have a license from the Bureau of Industry and Security ("BIS")...

> 15 C.F.R. § 736.2 (b)(4): General Prohibition Four (Denial Orders)—Engaging in actions prohibited by a denial order. You may not take any action that is prohibited by a denial order issued under part 766 of the EAR, Administrative Enforcement Proceedings.

> 15 C.F.R. § 764.2 (e): Acting with knowledge of a violation. No person may order, buy, remove,

3

> conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, . . . , any item exported or to be exported from the United States, . . ., with knowledge that a violation of the EAA, the EAR, or any order, license or authorization issued thereunder, has occurred . . . .

### Reports to the United States Government and the Automated Export System

7.  Pursuant to United States law and regulation, exporters and shippers or freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings are filed electronically through the Automated Export System ("AES") administered by the U.S. Department of Homeland Security, Customs and Border Protection, in Washington, D.C. The Shipper's Export Declaration ("SED") is one such required filing. The SED is necessary for all shipment requiring an export license and for shipments to embargoed countries.

8.  An essential and material part of the SED as well as other export filings is information concerning the end-user or ultimate destination of the export. In many cases, the identity of the end-user determines whether the goods may be exported without any specific authorization from the U.S. government, whether the goods may only be exported with the specific authorization or a validated license from the Commerce Department or Treasury Department, or whether the goods may not be exported from the United States.

9.  When submitting an SED electronically using the AES system, the exporter or entering party must certify that all statements made and all information contained therein is true and correct. The exporter or entering party is also informed that submitting false or fraudulent statements is punishable by both civil and criminal penalties under 13 U.S.C. § 305, 22 U.S.C. § 401, 18 U.S.C. § 1001 and 50 U.S.C. App. 2410.

### INVESTIGATION

10.  During the course of an investigation leading to prior proceedings, a cooperating witness ("CW") told law enforcement that one of the freight forwarders he/she utilized was Netherlands Freight Forwarding Company, and that his/her relationship with

4

Netherlands Freight Forwarding Company began in April 2007.[1]/ The CW established the relationship with Netherlands Freight Forwarding Company when his/her previous freight forwarding company refused to do business with him/her due to his/her ongoing problems with the U.S. Government relating to the shipment of U.S. origin goods to Iran. The CW also told law enforcement that his/her point of contact at his/her former freight forwarder left to work for Netherlands Freight Forwarding Company around the time the CW began doing business with Netherlands Freight Forwarding Company.

11.     On or about April 24, 2007, a Texas company shipped to The Netherlands Company 1, C/O Netherlands Freight Forwarding Company in The Netherlands, two Attitude Directional Indicators ("ADI"), Model 2591092-904, bearing the serial numbers 80120402 and 81010416, via Federal Express, Air Waybill. ADIs are aircraft instruments that demonstrate the level of flight of aircrafts. The packing slip included with the air waybill contained the following statement:

> [I]t is the responsibility of the ultimate consignee or his duly designated agent/forwarder in the USA to obtain a validated Export License for the equipment and components listed on this document from the Department of Commerce or the Department of State, if necessary under applicable United States Government export control regulations. Ultimate consignee must also provide application/end-user of items listed above and country of final destination if other than the USA.

The packing slip also noted:

> Unless otherwise noted this sale, order or quote may include Munitions List Items (MLI) or Commerce Controlled List Item (CCLI). MLI/CCLI property is controlled by the U.S. Government and in many cases cannot be transferred (exported, sold or given) to a foreign country, a non-U.S. citizen/National or a non-

---

[1]/    Later, on or about October 7, 2007, the U.S. Department of Commerce issued a Temporary Denial Order ("TDO") naming as respondents, the CW, among others, who were all in The Netherlands, as well as Company A, which was located in Country A. This TDO prohibited any of the respondents from involvement in the export, reexport or transshipment of U.S. origin goods subject to the EAR. The order also prohibited freight forwarders from exporting, reexporting or transshipping U.S. origin goods, subject to the EAR, on behalf of the respondents. The CW plead guilty to conspiracy to violate IEEPA in or about September 2009.

Permanent U.S. Resident without a valid State/Commerce Department export authorization.

12. On or about May 10, 2007, a fax from the CW to Employee 1 at Netherlands Freight Forwarding Company ("NFFC Employee 1") advised NFFC Employee 1 to "neutralize" the package, which included removing from the box the invoices and lists of items from the suppliers. Defendant ULRICH DAVIS sent a similar e-mail to a transport company in The Netherlands, which provided some of the transportation for the ADIs, on or about May 11, 2007, confirming a conversation between himself and the transport company representative earlier that day and providing instructions on how to "neutraliz[e] the boxes.

13. On or about September 25, 2007, Netherlands Freight Forwarding Company, acting on behalf of The Netherlands Company 2, exported a shipment of U.S. origin aircraft parts to Iran Aircraft Industries, an Iranian government entity responsible for manufacturing and maintaining Iranian Military Aircrafts.

14. The Netherlands Company 2 invoices that accompanied this shipment were stamped "Country of Origin: USA" and noted that the parts were intended for the "C-130 Red Half Moon." The "Red Half Moon," also known as the "Red Crescent," is the companion international organization to the American Red Cross. The C-130, however, is a military transport aircraft that is manufactured in the United States and used by the American military. It is also currently in service with the Iranian Air Force.

15. These parts were shipped to Iran on Iran Air flight 764 with air waybill number 096-9941-3602 on September 25, 2007. Defendant ULRICH DAVIS was listed as the employee of Netherlands Freight Forwarding Company responsible for the shipment.

16. A check of U.S. Department of State, U.S. Department of Commerce and U.S. Department of Treasury, Office of Foreign Assets Control records was conducted which revealed that neither defendant ULRICH DAVIS nor Netherlands Freight Forwarding Company had applied for or received authorization to ship U.S. origin commodities to Iran.

17. The CW further informed law enforcement that in or about December 2007, he/she was visited at his/her office by defendant ULRICH DAVIS. During this meeting, defendant ULRICH DAVIS reportedly asked the CW why he/she had not sent any new export shipments to Netherlands Freight Forwarding Company. The CW told defendant ULRICH DAVIS that he/she was not allowed to ship U.S. origin commodities due to the U.S. Department of Commerce

Temporary Denial Order ("TDO") imposed on him/her in or about October 2007, which prevented him/her from receiving goods from the United States.

18. The CW informed law enforcement that defendant DAVIS told the CW that the TDO was not a problem, and that defendant ULRICH DAVIS was assisting Company A with receiving goods from the United States. Defendant ULRICH DAVIS then added that Company A was receiving goods from the United States on a regular basis via New York Freight Forwarding Company. Defendant ULRICH DAVIS identified a company in Cedar Grove, New Jersey ("New Jersey Company"), as a company that was shipping U.S. goods to Company A in Country A via New York Freight Forwarding Company. New Jersey Company was in the business of reselling chemicals, lubricants, sealants, and other products used in the aircraft industry.

19. After receiving this information from the CW, law enforcement conducted a search of the Automated Targeting System ("ATS"), which is a database operated and maintained by the Department of Homeland Security, Customs and Border Protection ("CBP"). ATS tracks activity relating to the export activity of United States companies, as well as shipment to foreign consignees.

20. The search revealed that from in or about August 2007 until in or about January 2008, New York Freight Forwarding Company received from the New Jersey Company various products for shipment to Company A. Approximately three of the shipments were prepared after Company A was placed on the TDO. Defendant ULRICH DAVIS negotiated and caused to be negotiated the procurements from New Jersey Company.

21. For example, on or about October 1, 2007, New York Freight Forwarding Company submitted an electronically-filed U.S. Department of Commerce, Form 7525V, SED, using the AES, in connection to an export of goods from New Jersey Company to Company A. The SED filed by New York Freight Forwarding Company listed the country of ultimate destination for the shipment as The Netherlands. In fact, New York Freight Forwarding Company had been informed by New Jersey Company that the shipment was destined for Country A.

22. When SEDs are filed electronically with the U.S. Government, a review is conducted to determine if any of the consignees to the transaction are listed on Department of Commerce Denied Party Lists. The SED filed by New York Freight Forwarding Company for this export listed the ultimate consignee and address

of the consignee as Company A in The Netherlands, not Country A. The invoice, however, listed the Country A destination. The invoice was completed by the Air Export Manager of New York Freight Forwarding Company ("NYFFC Employee 1").

23. NYFFC Employee 1 informed law enforcement that when New York Freight Forwarding Company first began handling shipments for Company A in the summer of 2007, he/she was instructed by defendant ULRICH DAVIS to list The Netherlands as the country of ultimate destination for all exports when filing all SEDs for exports to Company A. Law enforcement determined that The Netherlands address was a Post Office Box.

24. Additionally, on or about November 15, 2007, Company A was listed as the exporter of a shipment of paint, organic peroxide and aerosols from The Netherlands to an Iranian Company located in Tehran, Iran. These commodities were exported to Iran aboard Iran Air, using air waybill number 096-9941-3716 by Netherlands Freight Forwarding Company. Defendant ULRICH DAVIS was listed as the employee of Netherlands Freight Forwarding Company responsible for the shipment.

25. Attached to the air waybill were several documents, which included two additional air waybills filed by New York Freight Forwarding Company: air waybill 369-3598-8492, dated August 21, 2007, and air waybill 988-7276-0262 dated September 28, 2007. The air waybills reflected that the products originated from New Jersey Company, and the Consignee's Name and Address were of Company A in Country A. Defendant ULRICH DAVIS directed New York Freight Forwarding Company to arrange for a trucking company to pick up the products from New Jersey Company and transport them to New York. Also included with the air waybills were Hazmat Declarations for these shipments.

26. Defendant ULRICH DAVIS sent a follow-up email to Company A on or about November 13, 2007, requesting additional instructions, explaining that Netherlands Freight Forwarding Company had sent all shipments to Tehran, except two, and that shipping instructions for those two were incorrect. Defendant ULRICH asked that Company A send new shipping instructions for air waybills 988-7276-0262 and 369-3598-8492. The e-mail indicated that defendant ULRICH DAVIS was aware that the goods coming from the U.S. were destined for Iran.

27. The shipment was stopped in The Netherlands on its way to Tehran due to problems with the hazardous goods statement.

28. Further, on or about November 20, 2007, New York Freight Forwarding Company exported a shipment of commodities from New Jersey Company to Company A. New York Freight Forwarding Company prepared air waybill number 988-7276-0321, signed by NYFFC Employee 1, that listed Company A's location as Country A. Instructions for handling this shipment were directed via e-mail, from defendant ULRICH DAVIS to NYFFC Employee 1.

29. On or about November 21, 2007, New York Freight Forwarding Company submitted an electronically-filed U.S. Department of Commerce, Form 7525V, SED, using AES in connection with an export of commodities from New Jersey Company to Company A in Country A. The form was last updated on or about November 22, 2007. The SED filed by New York Freight Forwarding Company listed the country of ultimate destination for this shipment as The Netherlands, when in fact New York Freight Forwarding Company had been informed by the exporter that the ultimate destination was Country A, and the air waybill associated with this export, 988-7276-0321, specified that the consignee, Company A, was located in Country A.

30. When SEDs are filed electronically with the U.S. Government, a review is conducted to determine if any of the consignees to the transaction are listed on the U.S. Department of Commerce Denied Party Lists. The SED filed by New York Freight Forwarding Company for the aforementioned export listed the ultimate consignee and address of the consignee as Company A in The Netherlands, rather than in Country A. An address in The Netherlands for Company A would not match the address included in the Denied Party Lists.

31. At the time that the SED was filed in AES, again, Company A was the subject of a U.S. Department of Commerce Temporary Denial Order. By shipping to Company A at The Netherlands address, US export controls that would have otherwise prevented this shipment under the TDO were evaded.

32. The shipment was subsequently shipped by Netherlands Freight Forwarding Company from Amsterdam to Iran on or about January 20, 2008. The Consignee was ANA Trading Co., a procurement arm of the Iranian military.

33. During the course of the investigation through various court-authorized processes, e-mail was recovered and reviewed. In an e-mail of January 24, 2008, defendant ULIRCH DAVIS responded to a representative of Company A in Country A ("Representative"), and copied to other employees of Netherlands Freight Forwarding Company as follows:

9

> Dear (Representative),
>
> Understandable your reaction regarding our acting in the service which we provide so far and i [sic] totally agree upto [sic] certain level.
>
> 99% of these goods were destined to be send to Teheran [sic]/Iran, which was and still is a very difficult destination due to political reasons.
>
> We have handled shipments to Teheran [sic] for various customers who had to shut down their operation because they were doing business with Teheran [sic]/Iran and inspite [sic] of the risk we take we always handled your shipments in a good manner. . . .
>
> Best Regards
>
> ULRICH DAVIS / Manager Business Development

34.  On or about January 28, 2008, NYFFC Employee 1 and Representative e-mailed each other regarding a shipment being handled by New York Freight Forwarding Company. Representative informed NYFFC Employee 1 that the shipment contained non-hazardous goods for a customer in Dubai, UAE. Later that day, Representative forwarded to defendant ULRICH DAVIS and another employee at Netherlands Freight Forwarding Company in The Netherlands his/her earlier e-mail response to NYFFC Employee 1 and stated, "this message should take care of the shipment at NY office. . . I am waiting for the news to make the decisions THR vs DXB??" THR is the airport code for Tehran, Iran and DXB is the airport code for Dubai, UAE.

35.  Later that same day, defendant ULRICH DAVIS e-mailed Representative and copied his co-workers, NFCC Employee 2 Netherlands Freight Forwarding Company and NYFFC Employee 1, and noted:

> Dear [Representative],
>
> I have transferred your message to my collegue in New York and he will take care for the ocean freight. I checked Friday night late how the current situation is in Teheran [sic] and seems that everything is back to normal concerning backlog

10

and embargoes. We will send the big shipment to THR, must we reroute the small shipments as well. ?

Please reply today.

Best regards

Ulrich Davis/Manager Business Development

36. The shipment discussed in this last e-mail exchange never occurred because the U.S. Government served subpoenas on New York Freight Forwarding Company in or about February 2008, and confirmed to New York Freight Forwarding Company that Company A was on the denied party list.

37. Additionally, on or about February 6, 2008, New York Freight Forwarding Company prepared a shipment of 84 kits of adhesive primer, valued at approximately $4,804.80, from New Jersey Company. The same day, on or about February 6, 2008, New York Freight Forwarding Company shipped to Netherlands Freight Forwarding Company, through Schiphol Airport, The Netherlands, the adhesive primer kits via Asiana Airlines, by Air Waybill number 988-7276-0435.

38. In making the arrangements for this shipment, defendant ULRICH DAVIS sent an e-mail to Company A on or about February 1, 2008, copying NYFFC Employee 1 and other NFFC Employees, in which he stated that:

> . . . [T]hey will send these goods via Amsterdam, because there are no Cargo Aircrafts from New York to Dubai or Teheran [sic], these shipments must be send to Amsterdam first and that goods mostly need to be re-labelled . . .

39. On or about February 6, 2008, a representative of New Jersey Company completed by hand an SED for the adhesive primer. The SED noted that the ultimate consignee for the adhesive primer was Company A located in Country A.

40. Additionally, on or about February 6, 2008, New York Freight Forwarding Company electronically filed with the U.S. Government, Form 7525V, SED, using the AES in connection with the export of the adhesive primer. The SED completed by NYFFC indicated that the ultimate Consignee was located in The Netherlands.

41. As part of the investigation, on or about February 12, 2008, law enforcement contacted New York Freight Forwarding Company, and detained the pending export of the adhesive primers.

11

On or about February 13, 2008, NYFFC Employee 1 admitted that he/she knew that Company A was located in Country A, but stated that he/she had been instructed by defendant ULRICH DAVIS at Netherlands Freight Forwarding Company to list the country of ultimate destination for all Company A shipments as The Netherlands rather than Country A.